## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

TAMMY L. LAFLER,

                    Plaintiff,

v.

CAROLYN W. COLVIN,

                    Defendant.

**DECISION & ORDER**
14-CV-6517

### Preliminary Statement

Plaintiff Tammy L. Lafler brings this action pursuant to Titles II and XVI of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for disability insurance benefits and supplemental security income.   See Complaint (Docket # 1).  Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  See Docket ## 10, 15.

### Background and Procedural History

On November 15, 2010, plaintiff applied for disability insurance benefits and supplemental security income. Administrative Record ("AR.") at 137–38.  On June 22, 2011, plaintiff received a Notice of Disapproved Claim.  AR. at 139– 45.  Plaintiff timely filed a request for a hearing before an

Administrative Law Judge ("ALJ").   AR. at 147—150.   On August
15, 2012, a hearing was held before ALJ Connor O'Brien.  AR. at
30—135.  Plaintiff appeared at the hearing with her attorney,
Justin Goldstein.   Id.   Peter A. Manzi, a Vocational Expert,
also testified at the hearing.  AR. at 30-135, 185, 195-99.   On
January 25, 2013, the ALJ issued a decision, determining that
claimant was not disabled under sections 216(i), 223(d), and
1614(a)(3)(A) of the Social Security Act.   AR. at 9-23.   On
March 29, 2013, plaintiff timely filed a request for review of
the ALJ's decision by the Appeals Council.  AR. at 7-8.  On July
22, 2014, the Appeals Council refused to review the ALJ's
decision, making the ALJ's decision the final decision of the
defendant Commissioner.   AR. at 1—6.   This federal lawsuit
followed.

## Medical History

Between January 30, 2009 and August 5, 2009, plaintiff saw
Dr. Dickinson, at Rushville Health Center (RHC) for a variety of
conditions  including  bronchitis,  urinary  tract  infection,
gynecological issues, urge incontinence, anemia, mood swings,
and fatigue.  AR. at 411-16.

On September 24, 2009, plaintiff returned to Dr. Dickinson
reporting neck, side, right shoulder and left ankle pain.   AR.
at  410.   Dr.  Dickinson  noted  that  plaintiff  was  in  mild
distress,  but  that  her  right  shoulder  was  normal  with  a  full

2

range of motion.    Dr. Dickinson diagnosed a likely heel contusion and possible early degenerative disc disease causing neck, shoulder, and side pain.    Id.    A subsequent left heel x-ray was negative.  AR. at 431.

Plaintiff saw a nurse practitioner, P. Mitchell, at RHC on December 10, 2009 for a cough.  AR. at 409.  Plaintiff reported incontinence, hand tingling, and emotional distress.  The nurse practitioner referred plaintiff to a urologist.  AR. at 409.

Dr. Dickinson completed a Medical Examination for Employability form on December 22, 2009.  AR. at 583-84.  He diagnosed plaintiff with depression.  AR. at 583.  He noted intermittent limitations with regards to plaintiff's ability to maintain attention and concentration, interact appropriately with others, maintain socially appropriate behavior, make simple decisions, and perform simple tasks.  Id.  Dr. Dickinson concluded that plaintiff was not "consistently" employable at that time.  AR. at 584.

Plaintiff saw Dr. Dickinson on January 13, 2010, for urinary frequency, assessed GERD, stress disorder/depression, and weight gain.  AR. at 408.  On January 15, 2010, Dr. Dickinson filled out an updated Medical Examination for Employment form.  AR. at 585-86.  He added urinary incontinence to plaintiff's diagnoses with a prognosis of "progressive over years," and indicated that he was prescribing Detrol as

3

treatment.   AR. at 585.   Plaintiff's assessment functions and depression diagnosis remained unchanged, and Dr. Dickinson again indicated that plaintiff could not work.  AR. at 586.

On January 27, 2010, plaintiff saw Dr. Dickinson for right shoulder pain.   AR. at 407.   On examination, there was tenderness and decreased passive range of motion.  Dr. Dickinson assessed right infraspinatus sprain and trapezius sprain.  Id. Plaintiff saw Dr. Dickinson on March 3, 2010, for follow up regarding blood work and her weight gain.  AR. at 406.   Dr. Dickinson diagnosed exogenous weight gain and recommended diet and exercise.  AR. at 406.

Plaintiff returned to Dr. Dickinson on March 23, 2010 to inquire about eligibility for disability.   AR. at 405. Plaintiff relayed that she had seen the referred urologist, who indicated she was "borderline" for surgery.  Medication was not effective for her bladder issues.  Id.  Dr. Dickinson assessed that plaintiff had limited job opportunities and was overweight, but had no qualifying disabilities.  Id.

Plaintiff saw Dr. Dickinson on August 2 and October 10, 2010 with complaints of bilateral leg pain with sitting, AR. at 404, generalized body aches, AR. at 402.  On August 14, 2010, Dr. Dickinson issued an opinion again indicating that plaintiff was unable to work.   AR. at 600-01.   On January 14, 2011, plaintiff saw Dr. Dickinson for a cough lasting one month, neck

4

pain, and labored breathing. She told the doctor that she coughed so hard it caused her to lose control of her bladder and interrupted her sleep. AR. at 400.

On February 2, 2011, Dr. Dickinson completed another Medical Examination for Employability form and found that plaintiff could work with some limits. AR. at 598. On February 4, 2011, plaintiff reported to Dr. Dickinson that she had been experiencing back and neck pain for the last month. AR. at 398. The examination notes indicate that plaintiff had fallen twice since the winter started. Id.

Plaintiff saw urologist Dr. Frederick Tonetti at the Center for Urology on February 23, 2011 for urinary incontinence, frequency, and urgency, including at night. AR. at 502-07. She was assessed with hematuria, hypertronicity bladder, stress incontinence, urinary frequency, and nocturia. AR. at 503.

On March 16, 2011, plaintiff reported to Dr. Dickinson for urinary frequency and pain in both hands with some tingling that radiated to the neck and shoulders, lasting five to six days. AR. at 395-96. She was also experiencing leg cramps. AR. at 395. Plaintiff noted that she was "somewhat active," specifying that she walks her dogs and sometimes shovels heavy snow, which causes her muscle soreness. Id. Dr. Dickinson again diagnosed her with incontinence of urine and obesity. Id.

Plaintiff was again treated by Dr. Tonetti, at the Center

for Urology, on April 21, 2011.   AR. at 509-16.   She reported voiding seven to eight times per day and nocturia one time.   AR. at 509.   An electromyelogram indicated that a guard reflex was not present.   Id.   Plaintiff's testing was otherwise normal. Dr. Tonetti diagnosed lower urinary tract symptoms with urge incontinence.   AR. at 515.

Plaintiff saw psychologist Dr. Christina Caldwell for consultative examination on May 11, 2011.   AR. at 440-43. Plaintiff reported that her sleep was disturbed by frequent awakening, she had excessive apprehension and worry, she was easily fatigued, restless, and had difficulty concentrating. AR. at 440.   Dr. Caldwell noted that plaintiff appeared suspicious and her insight and judgment were fair. Plaintiff was limping and using a cane.   AR. at 441.   Plaintiff reported that she cared for her personal needs, prepared food, cleaned, washed laundry, shopped, drove, and took public transportation, but needed help managing money.   AR. at 442.   She reported socializing regularly with friends and having happy relationships with her family.   Id.   Dr. Caldwell opined that plaintiff was limited in her ability to perform complex tasks independently; limited in her ability to make appropriate decisions; and limited in her ability to appropriately deal with stress.   Id.   Dr. Caldwell diagnosed anxiety disorder and noted a prior learning disorder.   Id.

On May 11, 2011, plaintiff reported to Dr. Karl Eurenius for an internal medicine consultative examination. AR. at 444-48. She reported having arthritis, carpal tunnel syndrome, leg cramps, memory loss, chest aching, overactive bladder, anemia, and difficulty gripping things with her hands. AR. at 444. She stated that she frequently lost urine with stress. Id. On examination, plaintiff was measured to be 5'1" and weighed 182 pounds. AR. at 445. She walked with a cane. Her squat was limited to ¼ and elicited pain in her low mid-back. Id. There was limited range of motion in the lumbar spine. AR. at 446. Straight leg raise test was positive bilaterally for both stead and supine. Id. There was also decreased range of motion for the bilateral shoulders. Id. Her gait, station and appearance were normal. AR. at 445. Her reflexes, sensations and strength were normal, as were her pulses. AR. at 447. She had no atrophy, varicosities, trophic changes, clubbing, edema, swelling, or joint instability. Id. Her hand and finger dexterity was intact and her grip strength was full, though she did have a positive Tinel's sign bilaterally. Id. Dr. Eurenius noted that "it was difficult to make diagnoses for this lady," but nonetheless diagnosed her with: (1) chronic low back pain; (2) symptoms of carpal tunnel syndrome with positive Tinel sign bilaterally; (3) frequent leg cramps in the thighs, unknown etiology; (4) abnormal chest pain; and (5) iron-deficiency

7

anemia.    AR. at 447.    Dr. Eurenius opined that plaintiff was "limited in prolonged standing, walking, climbing or descending stairs, bending, lifting, or carry due to chronic low back pain."    Id.    He further opined that plaintiff had "some limitations in reaching or handling objects due to symptoms and signs of bilateral carpal tunnel."    Id.

On June 2, 2011, plaintiff saw Dr. Arthur Equinozzi for a checkup at FLMA.  AR. at 521-23.  She reported back pain, though she noted that it was stable without much issue.  She had asthma and was overweight, but her obesity was stable.  AR. at 521. Plaintiff denied having urinary frequency anxiety or depression. AR. at 522.

On June 9, 2011, left shoulder and lumbar spine x-rays were negative.  AR. at 464-65.

Plaintiff saw neurologist Dr. Ziad Riafi at Ontario Neurology Associates on June 13, 2011 for bilateral hand tingling and possible weakness, neck pain radiating to the shoulders bilaterally, low back pain, and left foot numbness and tingling, mostly in the fourth and fifth toes.  AR. at 574-78. Plaintiff reported dropping items.  AR. at 574.  Plaintiff also described poor sleep, hearing loss, shortness of breath, heart palpitations, muscle aches, urinary incontinence, anxiety and memory loss.  AR. at 573-74.  Dr. Riafi diagnosed numbness, limb pain, neck pain, and low back pain.  AR. at 575.    Dr. Riafi

suspected that plaintiff's neck and shoulder pain was due to a strain or possibly underlying degenerative joint disorder. He thought her hand tingling might be due to a brachial plexus stretch, noting that there was no objective sign of weakness. He thought that her low back pain and foot tingling might be due to lumbosacral radiculopathy. Dr. Riafi recommended physical therapy. Id.

From June 21, 2011 to August 18, 2011, plaintiff went to physical therapy at Huson Physical Therapy for muscle weakness, back pain, and bilateral knee pain. AR. at 529-57. Range of motion of the bilateral knees was reduced and caused pain. Problems included balance, endurance, impaired flexibility, gait, muscle strength, pain, poor body mechanics, posture, and range of motion. AR. at 532. Her pain ranged from four to eight out of ten, and on her first day of physical therapy it was four out of ten in her knees and six out of ten in her back. AR. at 529, 531. Her back pain was worst when she woke up and when she bent over or moved a lot. AR. at 529. Her knee pain was worst with bending, transferring between sitting to standing, using stairs, and with prolonged sitting, standing, and walking. AR. at 529-30. Therapy was scheduled for two times per week for four weeks. AR. at 533.

Plaintiff saw Dr. Azfar Ahmed at Health First Family Medicine on November 16, 2011 for back pain. She denied any

specific injury or trauma but noted that she was experiencing progressively worsening back pain. AR. at 491. Examination was normal except for minimal tenderness of the paravertebral muscles. AR. at 491-92. Dr. Ahmed ordered an x-ray of the back, which was performed on December 5, 2011. AR. at 487. The lumbar spine x-ray indicated grade one retrolisthesis of L5 on S1 with disc space narrowing. AR. at 487.

On December 28, 2011, plaintiff saw orthopedic surgeon Dr. Steven Lasser at Interlakes Orthopedic Associates for lower back pain and neck pain. AR. at 497-98. On examination, there was generalized sensitivity and tenderness in the paravertebral musculature around L5-S1. AR. at 498. Range of motion was reduced in the lumbar and cervical spines. Id. There was mild trapezius spasm. Id. Plaintiff noted issues with her health insurance, and Dr. Lasser referred her to physical therapy and told her to make a return appointment when she was able. Id.

Plaintiff saw Dr. Tariq Hussain at Clifton Springs Orthopedics on May 10, June 26, and August 8, 2012, for right shoulder pain, right neck pain, left hip pain, joint stiffness and trouble walking. AR. at 567-69, 570-72, 589-90. Ibuprofen was not helping. AR. at 589. Plaintiff described pain in her left hip as "sporadic," and stated that she couldn't lay on her right side because it caused pain in her left hip. AR. at 567, 570. Her BMI was 34.77 and she weighed 184. AR. at 568. A

Hawkins-Kennedy impingement test was positive on the right shoulder. AR. at 590. Dr. Hussain noted that plaintiff's left hip was "doing well" after a number of visits, and he gave her a lidocaine injection in her hip. AR. at 590-91.

Plaintiff saw Dr. Riafi on July 18, 2012 for memory loss and concentration difficulties. AR. at 579-80. She stated that she forgot conversation, why she went into a room, to turn off the stove, and sometimes she repeated herself. AR. at 579. She also reported depression, anxiety, neck and back pain, and high cholesterol. AR. at 579-80. Dr. Riafi diagnosed memory loss and anxiety state, unspecified. AR. at 580.

Plaintiff saw Dr. Philip Vitticore at Ontario Neurology Associates on August 22, 2012, for worsening memory loss. AR. at 605-06. She had difficulty completing memory testing, including cube check, serial 7s, abstractions, repeating one of two sentences, and recall. AR. at 605. Dr. Vitticore diagnosed mild cognitive impairment, and noted that he felt that plaintiff gave full effort. AR. at 606. Dr. Vitticore ordered an MRI, an electroencephalogram (EEG), and neuropsychiatric testing. AR. at 605. The EEG dated August 30, 2012, indicated probable mild generalized encephalopathy, but a brain MRI was normal. AR. at 607-08.

### Hearing Testimony

<u>Testimony of Plaintiff</u>: On August 15, 2012, a hearing was

held before ALJ Connor O'Brien.  Plaintiff testified that she was born in 1965, is married, has two children, is 5'1" and weighs 181 pounds.  AR. at 38.  She stated that doctors have never mentioned her weight as a concern.  Id.  She completed two years of college at Canandaigua FLCC and received an associate degree.  AR. at 38-39.  She has a certification as a nurse's aide.  AR. at 39.  Plaintiff testified that she can read and write English and perform basic mathematics.  Id.  Plaintiff stated that she is able to drive.  AR. at 41.

Plaintiff stated that she was working as a housekeeper one day a week.  Id.  In this position she makes beds, vacuums, brings laundry downstairs, and refills room supplies.  Id.  She stated that she has asked for more hours but has not been given them.  AR. at 41-42.  Plaintiff also stated that if she were to be given more hours, she was not sure whether she would be able to take them.  She noted that she could "feel it" in her back and shoulder when she carried laundry up and downstairs.  AR. at 101.  Afterwards she feels tired, and she "hurt[s]."  Id. Plaintiff has a lengthy list of prior employment, which she went over with the ALJ and the Vocational Expert.  AR. at 43-66.

Plaintiff stated that she has: constant lower back pain; trouble holding anything in her hands, sore wrists, constant problems with her right shoulder, constant muscle spasms in her feet, muscle spasms in the backs of her lower legs on a daily

12

basis, numbness in her feet, and trouble with memory.  AR. at 67.  She stated that she first began noticing problems about five or six years prior.  AR. at 68.  No single event caused the problems, "just working and picking things up from work, the constant lifting, my lower back."  Id.

Plaintiff testified that she has problems with cold environments, that she has had bronchitis in the wintertime, and gets colds.  AR. at 69.  She has diagnosed carpel tunnel syndrome.  AR. at 71.  Plaintiff stated that Dr. Dickinson had likely diagnosed her with carpel tunnel, and that he had been her primary care doctor but that she left him because she was not happy with him.  AR. at 71-72.

Plaintiff stated that she has never had surgery related to her back or shoulders, had been receiving shots that were helping, and may need surgery if the shots stop being effective. AR. at 74.  When she sits still, plaintiff explained, she can be comfortable.  AR. at 75.

The plaintiff described that she had recently begun having shortness of breath, "where it feels like somebody's sitting on my chest."  AR. at 77.

The ALJ asked plaintiff about her overactive bladder. Plaintiff stated that doctors had tried several different medications, but her bladder problem was not impacted at all. AR. at 79.  She did not do exercises given to her at home

because they had not worked.  AR. at 79-80.

Plaintiff stated that she walks her dog outside in the yard of her apartment area for exercise.  AR. at 86.  She is able to shower and dress and cook and shop by herself.  AR. at 85.  She grocery shops with her husband about once a month.  Id. Plaintiff reads, watches television, goes shopping at craft stores, and goes out to eat at fast food restaurants.  AR. at 87-88.  She stated that she cannot walk more than about fifteen feet before she is "huffing and puffing for air."  AR. at 89. She can stand for about an hour before she has to sit down, but she has to get up within twenty minutes of sitting down.  AR. at 89-90.  She estimated that she can lift between eight and ten pounds.  AR. at 90.

Testimony of the Vocational Expert:  Peter A. Manzi, a vocational expert ("VE"), also testified at the hearing.  The VE classified plaintiff's past work as (1) ride attender, unskilled, SVP 2, light exertion in one context and medium exertion in another; (2) fast food worker, unskilled, SVP 2, light exertion; (3) cashier II, unskilled, SVP 2, light exertion; (4) day care worker, semi-skilled, SVP 4, light exertion; (5) assembler (ordnance), semi-skilled, SVP 3, light exertion; (6) short order cook, semi-skilled, SVP 3, light exertion; (7) poultry dresser, unskilled, SVP 2, heavy exertion but performed as light exertion; and (8) babysitter, semi-

14

skilled, SVP 3, medium exertion.   AR. at 108-09.

The ALJ asked the VE to consider a hypothetical individual in the category of medium exertion, "but she needs to be able to have a sit/stand option . . . if every sixty minutes she can sit for up to fifteen minutes without leaving her workstation, never climbing a rope, ladder or scaffolding," limited to occasionally reaching overhead with her right arm, and limited to no more than twenty pounds with only here right arm.   She can use the left arm or both together up to fifty pounds.   "Environmentally, she needs to avoid anything more than occasional exposure to extreme cold."   Limited to "occasional changes in the work setting."   No cognitive limitations.   AR. at 116-18.   The VE found that with this hypothetical, such a person would be able to perform the plaintiff's past work as an assembler (ordnance).

For the second hypothetical, the ALJ asked the VE to assume the same characteristics with the exertional limit changed to light, twenty pounds lifted occasionally, ten pounds more frequently, no more than ten pounds of lifting on the right side, twenty pounds of lifting occasionally with both arms or with the left arm.   Bilateral fingering limited to frequent. Same limitation on exposure to cold, same sit/stand option, occasional changes in the work setting, and not required to supervise others.   AR. at 121.   The VE responded that such a person would still be able to perform plaintiff's prior job as

15

the assembler (ordnance). AR. at 121-22. Such a person also would be able to work as a collator operator, listed in the Dictionary of Occupational Titles (DOT) as 208.685-010, light exertion, unskilled, SVP 2. The VE testified that there are 44,148 jobs nationally, and 205 in the Finger Lakes region. AR. at 122-23. Plaintiff could also perform the job as a photocopy-machine operator (DOT 207.685-014, light exertion, unskilled, SVP 2), of which there are 22,865 jobs nationally and 143 in the Finger Lakes region. AR. at 123.

The ALJ asked the VE to alter the hypothetical to "sedentary." The VE responded that such a person could perform the job of an addresser (DOT 209.587-010, sedentary, unskilled, SVP 2), of which there are 25,000 jobs nationally and 223 in the Finger Lakes region. Id.

The third hypothetical assumed an individual with the same limitations as the second hypothetical with the fingering limited to occasional and the handling on her right dominant side to frequent, and nothing more than speaking and signaling instructions to others. Id. The VE found that such a person could be a counter clerk (photo finishing) (DOT 249.366-010, light exertion, unskilled, SVP 2) of which there are 80,000 jobs nationally and 200 in the Finger Lakes region. AR. at 124-25. Such a person could also be a call-out operator (DOT 237.367-014, sedentary, unskilled, SVP 2) of which there are 16,000 jobs

16

nationally and 55 in the Finger Lakes region.  Another option was a surveillance system monitor (DOT 369.367-010, sedentary, unskilled, SVP 2) of which there are 16,763 jobs nationally and 63 in the Finger Lakes region.  AR. at 125.

For the fourth hypothetical, the ALJ included the factor that the individual is likely to be absent from work two or more times per month.  AR. at 125.  With this hypothetical, the VE indicated that such a person would not be able to work in the economy.  Id.

## Determining Disability Under the Social Security Act

The Evaluation Process:  The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

1.  The Commissioner considers whether the

claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving her case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that

Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five); see also 20 C.F.R. § 404.1560(c)(2).

When evaluating the severity of mental impairment, the reviewing authority must also apply a "special technique" at the second and third steps of the five-step analysis. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a). First, the ALJ must determine whether plaintiff has a "medically determinable mental impairment." Kohler, 546 F.3d at 265-66; see also 20 C.F.R. § 404.1520a(b)(1). If plaintiff has such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1). If plaintiff's mental impairment is considered severe, the ALJ "will first compare the relevant medical findings and the functional limitation ratings to the criteria

of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2).   If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266.   If not, the ALJ will then make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision:   In applying the five-step sequential evaluation, the ALJ made the following determinations.   At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 1, 2009, the alleged onset date of her disability.  AR. at 14.  At the second step, the ALJ found that plaintiff has severe impairments of chronic pain secondary to strain of the cervical spine; degenerative disc disease of the lumbar spine; a history of bronchitis; degenerative joint disease of the right shoulder; and anxiety.  AR. at 15.  At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have a listed impairment which would render her disabled under the social security listings.   AR. at 15-16.   The ALJ found that plaintiff had no restrictions in activities of daily living; no difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and experienced

no episodes of decompensation.   Id.

Accordingly, the ALJ moved to the fourth step, which required asking whether plaintiff has the residual functional capacity ("RFC") to perform her past work, notwithstanding her severe impairments.   The ALJ concluded that plaintiff had the RFC to perform light work, with the following limitations:

> [M]ust be able to alternate between sitting and standing to change positions for fifteen minutes every hour; she cannot climb ladders or scaffolds; the claimant is limited to occasional stooping, crouching, bending, twisting at the waist, balancing, climbing stairs or ramps, kneeling, or crawling; she can only occasionally reach overhead with her right, dominant, upper extremity; the claimant can frequently handle with her bilateral upper extremities; she is limited to lifting no more than ten pounds with her right hand alone; she can frequently, but not constantly, finger with her left hand, but only occasionally with her right hand; the claimant must avoid concentrated exposure to extreme cold; the claimant can tolerate occasional changes in the work setting; and the claimant can interact with others at no more than the Dictionary of Occupational Titles levels of speaking/signaling, or less (DOT people function levels 6, 7, and 8).

AR. at 17.   Based on the RFC, the ALJ determined that plaintiff could not perform her past relevant work.   AR. at 21.

Because plaintiff was unable to perform her past work, the ALJ proceeded to the fifth step, which is comprised of two parts.   First, the ALJ assessed plaintiff's job qualifications by considering her physical ability, age, education, and

previous work experience. Id. The ALJ next determined whether jobs exist in the national economy that a person having plaintiff's qualifications and RFC could perform. Id.; see also 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f). The ALJ found that "there are jobs that exist in significant numbers in the national economy" that plaintiff could perform, specifically working as a photo finish counter worker, a furniture rental consultant, a callout operator, and a surveillance systems monitor, pursuant to the VE's testimony. AR. at 21-22.

## Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine de novo whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir. 2007), cert. denied, 551 U.S. 1132. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683

22

F.3d at 447-48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial

evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff challenges the ALJ's decision primarily on the grounds that (1) the ALJ failed to consider and weigh the statements made by treating physician Dr. Dickinson, (2) the ALJ's RFC assessment at step four is unsupported by medical opinion, and (3) the Commissioner's removal of part of the record requires remand for further review. See Plaintiff's Memorandum of Law (Docket # 10-1); Plaintiff's Response (Docket # 19).

Failure to Properly Evaluate Treating Physician's Opinions: Plaintiff contends that the ALJ failed to properly evaluate the opinion and medical notes of Dr. Dickinson, her treating physician. See Plaintiff's Memorandum of Law (Docket # 10-1) at

24

13; Plaintiff's Response (Docket # 19) at 1. Specifically, plaintiff notes that the ALJ did not take into account Dr. Dickinson's opinions that plaintiff 1) had limitations on her ability to work, i.e. less than 30 hours; 2) had intermittent limitations regarding her ability to maintain attention and concentration, interact appropriately with others, maintain socially appropriate behavior, make simple decisions, and perform simple tasks; 3) suffered from depression; and 4) had urinary incontinence. Id. The Court agrees that the ALJ did not adequately discuss Dr. Dickinson's opinions regarding certain non-exertional limitations and urinary incontinence as those of a treating physician.

Dr. Dickinson was plaintiff's treating physician between the alleged onset date of September 1, 2009 and March 16, 2011, when plaintiff stopped seeing him. During that period of a year and a half, Dr. Dickinson saw plaintiff on at least eleven occasions and additionally completed three Medical Examination for Employability forms for the State Department of Social Services. AR. at 395-410, 583-88, 597-604.

While the ALJ's decision makes several references to Dr. Dickinson's medical examination notes, at no point does the ALJ describe the weight given to Dr. Dickinson's opinions or even describe him as a treating physician. Neither does the ALJ incorporate all of Dr. Dickinson's opinions of plaintiff's non-

exertional limitations into her RFC analysis.  While the ALJ may have accepted some of Dr. Dickinson's statements, there are other important opinions in the record that are left out or not adequately addressed in the ALJ's decision.  By not properly assessing Dr. Dickenson's opinions, the ALJ failed to appropriately apply the "treating physician rule."

Under the "treating physician rule," the ALJ must afford "a measure of deference to the medical opinion of a claimant's treating physician."  See Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); 20 C.F.R. § 404.1527(d)(2).  Accordingly, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given "controlling weight," so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [is] not inconsistent with the other substantial evidence in [the record]."  Lesterhuis v. Colvin, 805 F.3d 83, 88 (2d Cir. 2015) (citing 20 C.F.R. § 404.1527(d)(2)); see, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chatter, 221 F.3d at 134.

The Social Security Administration is required to explain the weight it gives to the opinions of treating physicians.  See 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion").  This is true

when the treating source's opinion is given controlling weight,
but is especially true if the opinion is not given the
controlling weight. See Burgess v. Astrue, 537 F.3d 117, 129
(2d Cir. 2008). In assigning what weight to give the opinions
of a treating doctor, the ALJ must consider, *inter alia*, the
"[l]ength of the treatment relationship and the frequency of
examination; the nature and extent of the treatment
relationship; the relevant evidence, particularly medical signs
and laboratory findings supporting the opinion; the consistency
of the opinion with the record as a whole; and whether the
physician is a specialist in the area covering the particular
medical issues." Id. (citing 20 C.F.R. § 404.1527(d)(2)(i)-
(ii), (3)-(5)) (internal quotations removed). "After
considering the above factors, the ALJ must comprehensively set
forth [her] reasons for the weight assigned to a treating
physician's opinion." Greek v. Colvin, 802 F.3d 370, 375 (2d
Cir. 2015) (citing Burgess, 537 F.3d at 129). The failure to
provide "good reasons for not crediting the opinion of a
claimant's treating physician is a ground for remand." Snell v.
Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see also Schaal v.
Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure
to provide 'good reasons' for apparently affording no weight to
the opinion of plaintiff's treating physician constituted legal
error."). The ALJ's failure to follow the treating source rule

27

was most evident in her evaluation of plaintiff's non-exertional impairments -- depression and urinary incontinence.[1]  This error was not harmless as these medical opinions might very well have impacted an accurate assessment of plaintiff's residual function capacity at step four.

Mental Impairments:  The ALJ's analysis of plaintiff's mental impairments is briefly set forth in a single paragraph on page nine of her decision.  In that truncated analysis, the ALJ notes that plaintiff saw Dr. Christina Caldwell for a psychological consultative examination on May 11, 2011 and Dr. Caldwell had determined that plaintiff was "limited in her ability to perform complex tasks independently, make appropriate decisions and appropriately deal with stress."  AR. at 20. Based on one consultative examination, Dr. Caldwell had diagnosed plaintiff with "a history of a learning disability and an anxiety disorder."  AR. at 442.  The ALJ gave Dr. Caldwell's opinion "some weight" but stated there was "sparse evidence of record related to the claimant's anxiety disorder and cognitive capabilities."  AR. at 20.

This Court's review of the record leads to an opposite conclusion.  Far from "sparse," the medical records of the treating physician Dr. Dickinson is replete with findings that

---

[1] Urinary incontinence is a non-exertional impairment.  See Mac v. Sullivan, 811 F. Supp. 194, 198 (E.D. Pa. 1993) (collecting cases).

plaintiff has been diagnosed multiple times with depression and anxiety.  AR. at 442, 573-74, 579-80, 583, 586.  As a treating physician, and based on clinical findings, Dr. Dickinson specifically diagnosed plaintiff with depression.  Based on his treatment history with plaintiff, he found that she had specific intermittent limitations with regards to maintaining attention and concentration, interacting appropriately with others, maintaining socially appropriate behavior, making simple decisions, and performing simple tasks.  AR. at 583-84, 600-01, 597-98.  In addition to noting these non-exertional limitations, Dr. Dickinson repeatedly opined that plaintiff was unable to work, and even when he adjusted his opinion to state that she could work part time, he maintained that she continued to have the same limitations.  AR. at 597-98.

Urinary Incontinence: The ALJ's decision is completely devoid of discussion about plaintiff's urinary incontinence. The record is filled with evidence indicating that plaintiff has suffered from ongoing incontinence, including multiple diagnoses made by Dr. Dickinson.  AR. at 390, 395, 597, 601.  Dr. Dickinson even referred plaintiff to see a urologist, Dr. Frederick Tonetti, at the Center for Urology.  AR. at 502-07. Plaintiff saw Dr. Tonetti on February 23, 2011, where he diagnosed her with hematuria, hypertronicity bladder, stress incontinence, urinary frequency, and nocturia.  AR. at 503.  Dr.

Christina Caldwell diagnosed plaintiff with an overactive bladder and leakage, AR. at 442, and Dr. Karl Eurenius noted that plaintiff has an overactive bladder and "frequently los[t] urine with stress and [was] taking medication for this." AR. at 444. The ALJ avoids mentioning any of these opinions in her decision. Yet the loss of bladder control is a non-exertional "impairment under the Social Security Act that must be considered to determine whether an applicant is disabled." Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003) (failure of ALJ to discuss claimant's medically documented bladder dysfunction requires remand); see also Badger v. Astrue, No. 1:11-cv-00778-MJD-TWP, 2012 WL 1801871, at *6 (S.D. Ind. 2012) ("Urinary incontinence constitutes an impairment under the Social Security Act that must be considered to determine whether a claimant is disabled."); March v. Comm'r of Soc. Sec. Admin., 559 F. Supp. 2d 722, 731 (N.D. Tex. 2008) ("incontinence may be an impairment for purposes of the Social Security Act and must be considered by the Commissioner in determining whether a claimant is disabled").

In sum, the ALJ's failure to recognize Dr. Dickenson as plaintiff's treating physician and then adhere to well established legal and regulatory precedent in evaluating his medical opinions and diagnoses violated "the treating physician

rule" and requires that this case be remanded.[2]

## Conclusion

For the reasons discussed above, this Court finds that the ALJ's decision was not supported by substantial evidence in the record. Therefore, plaintiff's motion for judgment on the pleadings (Docket # 10) **is granted,** and the Commissioner's motion for judgment on the pleadings (Docket # 15) is **denied** only insofar as this matter is remanded back to the Commissioner for further proceedings in accordance with this Decision and Order.

**SO ORDERED.**

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     March 24, 2016
           Rochester, New York

---

[2] The Commissioner's argument that any error was harmless because Dr. Dickinson's opinion that plaintiff could not work is a legal conclusion reserved to the Commissioner is not persuasive here. See Defendant's Memorandum of Law (Docket # 15-1) at 24 (citing 20 C.F.R. §§404.1527(d)(3),(e)(1) and 416.927(d)(3),(e)(1)). It is true that "a treating physician's statement that the claimant is disabled cannot itself be determinative." Snell v. Apfel, 177 F.3d at 133. However, the fact that a treating physician speaks to the ultimate issue does not exempt ALJs from their obligation to explain the weight given to the physician's opinions. Id. This is particularly true where, as evident here, the treating doctor's opinion is based on a long clinical history and the medical records contains findings and specific reasons for the treating source's conclusions. A treating physician's opinion as to the "nature and severity" of plaintiff's conditions, far from the ultimate issue, is exactly what treating physician should be speaking to. See Green-Younger, 335 F.3d at 106. As stated earlier, the ALJ's decision here does not even acknowledge Dr. Dickinson's status as a treating source, and contains none of the analysis required before a treating physician's opinion can properly be discounted or ignored.